Philip MALEY, Gene Waters and Patsy Waters, on behalf of themselves and all others (CM) similarly situated, Plaintiffs,

v.

DEL GLOBAL TECHNOLOGIES COR-PORATION, Leonard A. Trugman, Michael H. Taber Seymour Rubin, Na-tan Bertman, David Michael and De-loitte & Touche LLP, Defendants.

No. CIV.A. 00 CIV 8495.

United States District Court,
S.D. New York.

Jan. 29, 2002.

## OPINION APPROVING SETTLEMENT OF CLASS ACTION AND AWARDING ATTORNEYS' FEES

MCMAHON, District Judge.

The parties to this securities fraud class action submitted a proposed settlement to the Court for approval. For the reasons stated below, the settlement is approved, and the plaintiff's request for attorneys' fees is granted.

### I. *APPROVAL OF THE CLASS ACTION SETTLEMENT*

The settlement is valued at approximately $11.5 million, consisting of $2,000,000 in cash (plus interest); a Promissory Note of $2,000,000 (plus interest); 2,500,000 shares of Del Global Technologies Corp. ("Del Global" or the "Company") common stock valued at $6,250,000 [1]; and warrants for 1,000,000 shares of Del Global common stock exercisable at a strike price of $2.00 per share, expiring six (6) years from the date of execution, valued at $1,250,000. This recovery has been negotiated on behalf of a class (the "Class") consisting of all persons or entities who purchased the common stock of Del Global during the time period from November 6, 1997 to November 6, 2000,

---

1. This assumes a share value of $2.50. At the time of the hearing, the stock was trading at $3.00 per share. Because the current price is above $2.00 per share, the warrants are currently "in the money."

inclusive (the "Class Period")[2] against a company that admittedly had serious financial reporting problems and was in a precarious financial condition. These negotiations were made without the benefit of any governmental or agency investigation or prosecution. The proposed settlement provides a return of approximately 41% of maximum damages, which has been estimated at approximately $28,000,000.

This action was commenced in November 2000 after intensive factual and legal investigation, including interviews with former employees of Del Global, some of whom provided documents; consultation with experts; a review of all of the Company's Forms 10–Q, 10–K and other filings with the Securities and Exchange Commission ("SEC") during the three-year Class Period; all of its news releases, all news articles regarding Del Global, and industry reports. Counsel made multiple appearances before the Court. Motions to dismiss were briefed fully. The settlement was achieved after extensive arms-length negotiations while the motions to dismiss were *sub judice*. These negotiations were conducted against a background of Del Global's precarious financial condition, its possible imminent bankruptcy, its de-listing from the NASDAQ national exchange, subsequent trading in the "pink sheets,"[3] and its investigation—initiated after the within action was commenced—by the SEC.

Pursuant to the Court's November 13, 2001 Order, plaintiffs arranged for the mailing and publication of notice of the settlement to the Class. The Court found that the printed Notice and the Summary Notice constituted the best notice practicable and complied fully with the requirements of Rule 23 and of due process. A hearing occurred on January 28, 2002 to determine whether the proposed settlement is fair, reasonable, and adequate. The deadline for shareholders to object or opt-out was January 7, 2002.

## A. THE STANDARDS FOR JUDICIAL APPROVAL OF CLASS ACTION SETTLEMENTS

■ "The law favors settlements of class actions no less than of other cases." *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 590 (S.D.N.Y.1992) (citing *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982)). In order to approve a class action settlement, a court must determine that the proposed settlement is "fair, reasonable and adequate." *Weinberger*, 698 F.2d at 73; *In re Warner Communications Sec. Litig.*, 618 F.Supp. 735, 740–41 (S.D.N.Y.1985). Under Second Circuit law, the factors to be considered in determining whether a proposed settlement is fair, reasonable and adequate include: (a) the complexity, expense and likely duration of the litigation; (b) the reaction of the class to the Settlement; (c) the stage of the proceedings and the amount of discovery completed; (d) the risks of establishing liability; (e) the risks of establishing damages; (f) the risks of maintaining the class action through trial; (g) the ability of the defendants to withstand a greater judgment; (h) the range of reasonableness of the Settlement Fund in light of the best possible recovery; and (i) the range of reasonableness of the Settlement Fund to a possible recovery in light of all the attendant risks of litigation.

---

**2.** Excluded from the Class are the Defendants herein, members of the immediate family of the individual defendants, and affiliates, successors and assigns of the individual and corporate defendants.

**3.** The "pink sheets" is a daily publication of the National Quotation Bureau that details the bid and asked price of thousands of over the counter (OTC) stocks. Many of these stocks are not carried in daily OTC newspaper listings.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974); *In re American Bank Note Holographics, Inc. Sec. Litig.*, 127 F.Supp.2d 418, 424 (S.D.N.Y.2001).

Furthermore, approval of the Settlement is within the Court's broad discretion. *In re Painewebber Ltd. Partnerships. Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir.1997). In its exercise of that discretion, a court must engage in a careful balancing act: "The Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Grinnell*, 495 F.2d at 462. *Grinnell* also instructs:

It is not necessary in order to determine whether an agreement of settlement and compromise shall be approved that the court try the case which is before it for settlement ... Such procedure would emasculate the very purpose for which settlements are made. The court is only called upon to consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable.

*Id.* at 462 (citing *Neuwirth v. Allen*, 338 F.2d 2 (2d Cir.1964)).

■ Consideration of the above factors in this case weighs in favor of final approval of the proposed settlement.

## B. THE PROPOSED SETTLEMENT MEETS THE STANDARDS FOR APPROVAL OF CLASS ACTION SETTLEMENTS

### 1. The Complexity, Expense and Likely Duration of the Litigation Weigh In Favor Of Approving the Settlement

This case qualifies as complex, both in establishing liability and in proving damages. Plaintiffs asserted claims under the Federal Securities Laws and common law extending over a three-year class period from November 6, 1997 through November 6, 2000. To support these claims, plaintiffs would have to establish that Del Global's publicly reported financial results were materially overstated in violation of Generally Accepted Accounting Principles ("GAAP") throughout the three-year period.

Moreover, the claims were asserted not merely against the Company and its chief executive and financial officers, but against outside directors who had either held management positions during the Class Period or were members of Del Global's audit committee, or against Del Global's outside auditor Deloitte & Touche ("Deloitte"). Each of these defendants had different relationships and connections to the alleged fraud. Added to the complexity of the case was the prospect of a long and contentious litigation. All five Del Global locations were implicated in the alleged improper practices, necessitating testimony of numerous witnesses in the New York locations and in Chicago.

Further, the case required the engagement of both accounting and damages experts. In assessing the merits of the Settlement, Plaintiffs' Counsel considered the wide-ranging factual and legal questions that were vigorously disputed in the Action. Plaintiffs' Counsel were aware that many of the defenses that had been or would be asserted by the various Defendants had some possibility of success. This uncertainty made the outcome of the case problematic, especially when weighed against the immediate and tangible benefits conferred by the Settlement.

Moreover, further discovery in this case would have been complex and time consuming given that plaintiffs were likely to encounter hostile witnesses who would not

admit wrongdoing. Although plaintiffs had already engaged in extensive investigation at the time of the settlement—including review of numerous documents and interviews with former employees of the Company—a great deal more disclosure, both factual and expert, was anticipated. Summary judgment motions were possible, extensive trial preparation was inevitable, and post-judgment appeals were highly likely. All of the foregoing would have extended the case and delayed the ability of the Class to recover for years.

Finally, the Action involves difficult issues of law and fact. For example, complex accounting questions relating to revenue recognition and inventory were raised by the complaint. Many of these issues would require proof through expert testimony concerning such issues as proper accounting practices, the degree to which Class Members suffered damages and the extent to which the decline in the value of Del Global shares was attributable to general economic conditions · affecting Del Global. The expenses of continued litigation would further burden any recovery obtained for the Class, that is assuming Plaintiffs recovered more than the Settlement now before the Court, if they were to recover at all. Defendants' expenses, which would consume Del Global's insurance, would be correspondingly high.

Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay of trial. These factors weigh in favor of the proposed Settlement. As the court in *Slomovics v. All for a Dollar, Inc.*, 906 F.Supp. 146, 149 (E.D.N.Y.1995), concluded: "The potential for this litigation to result in great expense and to continue for a long time suggest that settlement is in the best interests of the Class." *Id.* (Citation omitted). The same reasoning applies here. Delay, not just at the trial stage but through post-trial motions and the appel-

late process, would cause Class Members to wait years for any recovery, further reducing its value. *See Grinnell*, 495 F.2d at 467; *In re American Bank Note,* 127 F.Supp.2d at 424–25.

### 2. *The Favorable Reaction of the Class Weighs In Favor of Approving the Settlement*

■ It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy. *In re American Bank Note,* 127 F.Supp.2d at 425 (citing *Sala v. Nat'l R.R. Passenger Corp.,* 721 F.Supp. 80, 83 (E.D.Pa.1989)). In fact, the lack of objections may well evidence the fairness of the Settlement. *Paine-Webber,* 171 F.R.D. at 126.

2,086 notices were sent to potential Class members or their nominees. *See* Garr Affidavit. The deadline for Class members to file objections to the Settlement was January 7, 2002. Through that date, not a single objection to the Settlement was received and only two potential class members have sought to be excluded from the Settlement—one of whom actually profited from his Del Global transactions and thus would have not been entitled to any recovery even if he had not sought exclusion. *See* Garr Affidavit. The favorable reaction of the Class is strong evidence that the Settlement is fair, reasonable, and adequate. *In re American Bank Note,* 127 F.Supp.2d at 425 (settlement warrants approval where there were no objections and five shareholders sought exclusion). See *Grinnell,* 495 F.2d at 462; *In re Michael Milken & Assoc. Sec. Litig.,* 150 F.R.D. 46, 56 (S.D.N.Y.1993) ("another significant factor is the absence of any negative response of the members of the Class."); *see also National R.R. Passenger Corp.,* 721 F.Supp. at 83 ("reaction of the class to the settlement is perhaps the most

significant factor to be weighed in considering its adequacy").

Since last September, the Court received three lengthy anonymous letters from a person or persons who styled themselves "Two Stockholders of Del Global." In addition, the Court received a copy of a letter to plaintiffs' counsel, objecting to the settlement. The letter post-dated the objection period set out in the Notice to Class Members, and was therefore untimely. Two of those letters were faxed to the Court in the dead of night only hours before the final settlement hearing. The legend at the top of the faxed pages revealed that the sender was someone named Rudy Fessler. Counsel identified Fessler as a former Del Global employee and stockholder, from the lower management ranks, having no responsibility for finance or accounting, who had been interviewed on several occasions by plaintiffs' counsel. Counsel indicated that Fessler was not interested in any settlement, but rather in the imposition of criminal liability against certain former officers and directors of the company. That, of course, is beyond the purview of this Court.

Treating Fessler's belated submission as a timely objection, this makes one objector to the settlement—an insignificant showing of opposition to an otherwise acceptable deal. As the Court stated during the hearing, approving this settlement in no way expresses a view concerning the propriety or impropriety of the individual defendants' business conduct, or absolves them of responsibility for any wrongdoing in which they may have engaged. Rather, it represents the Court's considered judgment that the settlement offer provides fair and reasonable (albeit not total) compensation to a discrete group of shareholders (the class members) whose total potential recovery (upside) can be calculated at this point in time.

At the settlement hearing, the Court heard from David Deutsch, Esq., a shareholder who had no objection to the basic contours of the settlement—in particular, he thought the amount of the settlement to be reasonable and he encouraged prompt approval—but who wanted the class period to include earlier dates, so that more of his shares would be eligible to be part of the settlement fund. The Court finds this objection to be without merit, for the reasons explained to Mr. Deutsch on the record.

### 3. The Stage of Proceedings and the Amount of Discovery Completed

■ "[T]he stage of the proceedings and the amount of discovery completed" is another factor that may be considered in determining the fairness, reasonableness and adequacy of a settlement. To approve a settlement, however, "the Court need not find that the parties have engaged in extensive discovery." *In re American Bank Note*, 127 F.Supp.2d at 425–26; *In re Austrian and German Bank Holocaust Litig.*, 80 F.Supp.2d 164, 176 (S.D.N.Y.2000) (citing *Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir.1982)); *In re APAC Teleservices, Inc. Sec. Litig.*, No. 97 Civ. 9145, at 2 (S.D.N.Y. Dec. 10, 2001) (Jones, J.) (approving settlement prior to the commencement of depositions) (Schoengold & Sporn, P.C. co-lead counsel); *Caribiner*, No. 99 Civ. 2271 (approving settlement prior the commencement of depositions); *In re Versatility, Inc. Sec. Litig.*, No. 98 Civ. 1676(JES) (Nov. 13, 1998) at 9–10.

Settlement was reached after almost one year and following numerous appearances before the Court, interviews with former employees of Del Global, review of documents and the full briefing by the parties of multiple defendants' motions to dismiss. Given that the Company was and remains in difficult financial straits—indeed, it has yet to file its updated financial informa-

tion—the relatively quick settlement provides a certain benefit to the Class and a benefit to the Company and its current shareholders. As Judge Sprizzo stated in *In re Versatility,* No. 98 Civ. 1676, at 9–10:

... This is one of those cases in which, had it gone on long enough, the plaintiffs might have well wound up with nothing but unsecured claims in the Bankruptcy Court, because Versatility is in bad financial shape, or it is at least not in great financial shape, and the settlement may save the company from going into bankruptcy. Therefore, from the company's point of view, it is a good settlement and reflects, I think, the best interests of the shareholders and the intelligence of the lawyers involved. No one profits when we put a corporation into bankruptcy. Jobs are lost, companies are out of business.

As set forth above, here, Plaintiffs conducted an intensive and extensive investigation into' the alleged wrongdoing of the Defendants. Confirmatory discovery—which included the production of tens of thousands of pages of documents, interviews with senior Del Global officials and the inspection of Del Global's Valhalla, New York facilities—further reinforced the conclusion that the Settlement reached was fair, reasonable and adequate. Thus, Plaintiffs' Counsel possessed a record sufficient to permit evaluation of the merits of Plaintiffs' claims, the strengths of the defenses asserted by Defendants, and the value of Plaintiffs' causes of action for purposes of settlement.

### 4. *The Risks of Establishing Liability*

■ In assessing the Settlement, the Court should balance the benefits afforded to members of the Class and the immediacy and certainty of a substantial recovery for them against the continuing risks of litigation. *See Grinnell,* 495 F.2d at 463; *Warner,* 618 F.Supp. at 741. As set forth

above, there was a substantial likelihood that the continuation of the litigation would force the Company into bankruptcy and that the insurance company would disclaim coverage with respect to certain Defendants. The Settlement provides the Class with a substantial benefit that can actually increase in value with time. In addition, while Plaintiffs believe there is substantial evidence to support their claims, the complexities and uncertainties of this litigation nevertheless warrant the approval of the Settlement.

Securities litigation generally involves complex issues of fact and law, and this case is no exception. *See In re American Bank Note,* 127 F.Supp.2d at 426 (recognizing, substantial risk in proving scienter); *Zerkle v. Cleveland–Cliffs Iron Co.,* 52 F.R.D. 151, 159 (S.D.N.Y.1971) ("Stockholder litigation is notably difficult and unpredictable."). Several obstacles to Plaintiffs' ultimate recovery on the merits exist in this case: (a) establishing that Del Global made material misrepresentations or omissions, including reporting financial statements in violation of GAAP and Generally Accepted Auditing Standards ("GAAS") throughout the three year Class Period; (b) with respect to plaintiffs' claims under Rule 10b–5, establishing that all Defendants, including the outside director Defendants and Deloitte, acted with the requisite degree of scienter, *see All For A Dollar,* 906 F.Supp. at 149 (noting difficulty of proving scienter at trial); (c) establishing that the decline in Del Global stock at the end of the Class Period was caused by the revelation of the alleged fraud; (d) establishing the roles of specific individual defendants in the fraud; (e) establishing whether claims against Deloitte in connection with its auditor report for Del Global's fiscal year 1997 were time-barred; and (f) getting a jury to understand the many complex issues during a trial that could go on for weeks.

Plaintiffs' Counsel recognized that Defendants planned to mount a strong defense to the claims asserted, and that there were substantial risks in proving the claims asserted. These risks as to liability militated in favor of the Settlement.

### 5. *The Risks of Establishing Damages*

Even if plaintiffs were to overcome the aforementioned obstacles and were successful in establishing liability, plaintiffs have avoided substantial risks in proving damages by virtue of this proposed Class Settlement. In a Section 10(b) action, the range of damages is the "out of pocket" damage measure, *i.e.*, "the difference between the purchase price and the value of the stock [*i.e.*, value absent the fraud] at the date of purchase." *In re Greenwich Pharmaceutical Sec. Litig.*, 1995 WL 251293, *4, 1995 U.S. Dist. LEXIS 5717, *10 (E.D.Pa.1995) (citations omitted). The determination of damages, like the determination of liability, is a complicated and uncertain process, typically involving conflicting expert opinions. Conceivably, a jury could find that damages were only a fraction of the amount that plaintiffs contend. A jury could be swayed by experts for the Defendants, who would minimize the amount of Plaintiffs' losses. *In re American Bank Note*, 127 F.Supp.2d at 427. *See, e.g., United States v. 412.93 Acres of Land*, 455 F.2d 1242, 1247 (3d Cir.1972).

### 6. *The Ability of Defendants to Withstand a Greater Judgment*

As noted above, given Del Global's dire financial condition, it is unlikely that the Company could withstand a substantial judgment. *See In re Versatility*, No. 98 Civ. 1676(JES) at 9–10. Although recovery might also be possible from the individual defendants, such recovery depends on establishing a primary violation by them, including establishing their role in the alleged fraud and control person liability on their part. Recovery against Deloitte would be especially difficult in that it would require showing violations of GAAP and GAAS, and would require overcoming Deloitte's statutes of limitations argument in connection with its 1997 audit.

Given these conditions, obtaining a greater recovery than provided by the Settlement would have been difficult. *See, e.g., In re American Bank Note*, 127 F.Supp.2d at 427. One viable source of funds is the Directors' and Officers' insurance policies covering the individual defendants, but those policies would be significantly depleted by defense costs or the possibility of the insurance carriers disclaiming.

### 7. *The Range of Reasonableness of the Settlement Fund In Light of the Best Possible Recovery*

The "best possible" recovery necessarily assumes Plaintiffs' success on both liability and damages covering the full Class Period alleged in the Complaint as well as the ability of Defendants to pay the judgment. The settlement here provides the Class with the maximum available cash—in light of the limited insurance coverage and poor cash position of the Company—while also providing substantial compensation in equity and notes. This latter form of recovery permits the Class to participate in any appreciation in the Company's financial condition.

Thus, although the parties sharply dispute the amount of damages, if any, sustained by the Class, the recovery obtained in the Settlement is substantial. Assuming plaintiff's damages estimate to be the more accurate, the proposed settlement represents approximately 41% of the best case scenario. This is high for class action settlements of this magnitude.

In *Grinnell,* the Second Circuit noted that "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell,* 495 F.2d at 455. The court further noted, "[t]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* at 455 n. 2. In *Gulf Oil,* for example, a settlement was approved which provided for roughly $0.48 per share of a potential $30 per share recovery. *In re Gulf Oil,* 142 F.R.D. at 590; *see also Painewebber,* 171 F.R.D. at 130 (court's determination turns on whether the settlement falls within a "range of reasonableness"). As one court noted, "On a relative basis, Professor Coffee reports that a recent study shows that settlements since 1995 of securities class actions 'have recovered between 5.5% and 6.2% of the class members' estimated losses.' (citing Laura Simmons, *Securities Lawsuits: Settlement Statistics for Post-Reform Act Cases* (1999) at 4)." *In re Rite Aid Corp. Sec. Litig.,* 146 F.Supp.2d 706, 715 (E.D.Pa.2001). *See also Caribiner,* No. 99 Civ. 2271 (approving settlement that recovered only $0.12 on the dollar). The settlement in this case is highly favorable when compared with these recent settlements, especially as the company's stock has appreciated since litigation began.

### 8. The Range of Reasonableness of the Settlement Fund to Possible Recovery In Light of All the Attendant Risks of Litigation

The enormous risks of litigation are why settlement is frequently preferred. Settling avoids delay as well as uncertain outcome at summary judgment, trial and on appeal. The legal and factual difficulties inherent in this case, as described above, coupled with the unpredictability of a lengthy and complex trial, and the appellate process that would follow, with the risk of reversal, make the fairness of this substantial settlement readily apparent.

### i. The Settlement Negotiations Support Approval of the Settlement

In the Court's determination of whether the Settlement is fair, reasonable, and adequate, "attention also has been paid to the negotiating process by which the settlement was reached." *Weinberger,* 698 F.2d at 74. Courts have looked to ensure that the settlement resulted from "arm's length negotiations" by plaintiffs' counsel possessed of "experience and ability" who "have engaged in the discovery, necessary to effective representation of the class's interests." *Id.* (citation omitted); *Grinnell,* 495 F.2d at 463–66.

In this context, courts routinely add the voice of experienced counsel to the mix of considered factors. *PaineWebber,* 171 F.R.D. at 125 (" 'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.") (citation omitted). The qualified and experienced counsel for both sides here recommend final approval of the Settlement.

The Settlement negotiations here were extensive, hard fought and took place at arm's length between experienced and skilled attorneys. In particular, the settlement negotiations in this case, among other things: (i) occurred over a period of several months; (ii) involved many in-person meetings between Defendants' Counsel and Plaintiffs' Lead Counsel; (iii) involved the Defendants' insurance carriers; and (iv) included discussions of the Company's financial condition, including the possibility of its bankruptcy. "So long as the integrity of the arm's length negotiation process is preserved a strong initial presumption of fairness attaches to the proposed settlement." *PaineWebber,* 171

F.R.D. at 125. That presumption clearly should attach here. In addition, Plaintiffs' counsel and their financial expert performed a confirmatory "due diligence." *See* Laitman Affidavit and Affidavit of John C. Hammerslough in Support of the Settlement.

## C. THE COURT SHOULD APPROVE THE PROPOSED PLAN OF ALLOCATION

■ "To warrant approval, the plan of allocation must also meet the standards by which the ... settlement was scrutinized—namely, it must be fair and adequate." *In re MicroStrategy Inc. Sec. Litig.,* 148 F.Supp.2d 654, 668 (E.D.Va.2001); *see Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1284–85 (9th Cir.1992). An allocation formula need only have a reasonable, rational basis, particularly if recommended by "experienced and competent" class counsel. *White v. NFL,* 822 F.Supp. 1389, 1420–24 (D.Minn.1993), *aff'd,* 41 F.3d 402 (8th Cir.1994). *See also In re Oracle Sec. Litig.,* 1994 WL 502054, \*1, 1994 U.S. Dist. LEXIS 21593, \*3 (N.D.Cal. Jun. 18, 1994) ("A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable.").

The proposed Plan of Allocation, which was devised by experienced plaintiffs' counsel who are familiar with the relative strengths and weaknesses of the potential claims of Class members, satisfies the same standards of fairness, reasonableness, and adequacy that apply to the overall settlement.

The proposed Plan of Allocation reflects the proposition that the decreases in the price of Del Global common stock occurring upon the revelations made by Del Global on or about November 6, 2000 reflected the elimination of the maximum amount of artificial inflation that the Defendants' alleged misrepresentations may have caused during the Class Period. Specifically, "Recognized Claims" will be calculated as follows:

i. Claimants who purchased or otherwise acquired shares of Del Global common stock during the Class Period and held the stock through the end of the Class Period shall have a Recognized Loss of 100% of the difference between the price paid (not including brokerage fees and commissions) and $1.93 per share;

ii. To reflect the alleged inflation in the price of the stock at the time of sale, claimants who bought and sold shares of Del Global common stock during the Class Period shall have a Recognized Loss of 20% of the difference between the total price paid (not including brokerage fees and commissions) and the price received.

Finally, the favorable reaction of the Class supports approval of the proposed Plan of Allocation. As noted above, no Class member has objected to the Plan of Allocation, although more than 2,000 notices have been distributed. The proposed Plan of Allocation is a fair, reasonable, and adequate method for allocating the Net Settlement Fund among the various members of the Class.

## II. PLAINTIFFS' MOTION FOR APPROVAL OF ATTORNEYS' FEES AND EXPENSES IS GRANTED

Plaintiffs' Class Counsel seek 33⅓% of the Settlement Fund, to be paid *pari passu, i.e.,* in the same proportions of cash, notes, common stock, and warrants as the class will receive.[4] (with 82% of the fees

---

4. Counsel, in seeking payment *pari passu* with the recovery to be received by members of the Class, will bear the same risks of the "paper" components of the Settlement as the Class. Thus, Counsel has not only borne the risk of prospecting the action without any payment but is also at risk to lose most (84%) of its fees if there is a future downturn at the Company.

being paid in common stock, warrants and notes, and only 18% in cash). It is to be noted that only about 1/6th of the settlement is in cash[5] and the balance is by corporate note and equity of the Company.[6] They also seek reimbursement of $200,371.93 for costs and expenses in prosecuting this matter. The motion is granted.

Through their efforts, after intensive investigation, concentrated litigation and extensive arm's-length bargaining, and without the benefit of any governmental agency's investigation, Class Counsel have secured a settlement fund which confers an excellent benefit to the Class now valued at approximately $11.5 million.

At the time of executing the Stipulation of Settlement and sending Notice to the Class in November 2001, the common stock was trading at $1.50 per share, then making the Settlement Fund approximately $10,000,000. Since the announcement of the settlement, the trading price of the stock has increased to approximately $3.00 per share,[7] thus increasing the value of the stock component, and indeed strengthening the warrant component, as the warrants are exercisable at $2.00 per share. The warrants are "in the money."

The class notice indicated the "outside" number of damages are approximately $28 million. Thus, an $11,500,000 settlement provides members of the class with a recovery of in excess of 40%, which this Court has found to be an excellent settlement amount.

Courts in this and nearby Districts have recently awarded 33 ⅓% in securities class actions where there has been a significant monetary recovery early on in the litigation. *See In re APAC Teleservices, Inc. Sec. Litig.*, No. 97 Civ. 9145, at 2 (S.D.N.Y. Dec. 10, 2001) (Jones, J.) (awarding 33⅓% of an all cash $21 million settlement prior to the commencement of depositions) (Schoengold & Sporn, P.C. co-lead counsel); *Newman v. Caribiner Int'l, Inc.*, No. 99 Civ. 2271 (S.D.N.Y. Oct. 19, 2001) (Lynch, J.) (awarding 33⅓% of an all cash $15 million settlement prior the commencement of depositions); *In re Safety Components, Inc. Sec. Litig.*, 166 F.Supp.2d 72, (D.N.J.2001) (fee award of 33⅓% of the settlement fund). Significantly, these awards were made where Counsel was not assuming any risk in the form of payment.

As set forth in the charts annexed to the moving Affidavit, Plaintiffs' Class Counsel's combined lodestar is in the amount of

---

The risk here is significantly greater than the risk Counsel assumed by plaintiffs' counsel in *In re American Bank Note Holographics, Inc., Sec. Litig.*, 127 F.Supp.2d 418 (S.D.N.Y.2001) (McMahon, J.), where counsel's full lodestar was paid in cash and where the equity issued had not been delisted from a national exchange.

5. Of course there is risk and uncertainty in the non-cash portion of the settlement. Hopefully, the Company will continue to grow and prosper. There is also an "upside" to the stock and warrant components if the company does indeed grow and prosper.

6. Submitted in support of the motion are separate affidavits annexed as Exhibits C–P to

the Affidavit Of Joel P. Laitman In Support Of Application For Attorneys' Fees And Reimbursement Of Expenses, accompanying this Memorandum (the "Laitman Affidavit"), detailing the professional backgrounds and experience of counsel, the names of the lawyers who worked on this case, the number of hours expended, the respective current billing rates, their resulting lodestar figure, and a schedule showing their disbursements. A summary of each firm's total lodestar and each firm's total expenses is attached to the Laitman Affidavit as Exhibit B.

7. In the week prior to the settlement hearing, the stock traded as low as $2.85 and as high as $3.25.

$823,017.75. Thus, if the Court awards the 33⅓% requested, or $3,832,950.00, it will amount to a multiplier of 4.65, well within the range awarded by courts in this Circuit and courts throughout the country. *See, e.g., Newman,* No. 99 Civ. 2271 (awarding a 7.7 multiplier); *Roberts v. Texaco, Inc.,* 979 F.Supp. 185, 198 (S.D.N.Y.1997) (awarding a 5.5 multiplier). However, all but $666,600 of the fee will be paid in "paper" and thus is subject to significant risk.

## A. COMPENSATION TO THE ATTORNEYS IS APPROPRIATE

 A long-standing principle of equity allows a person who maintains a suit that results in the creation, preservation or increase of a common fund in which others have a common interest to be reimbursed from that fund for attorneys' fees and litigation expenses. *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). The Supreme Court has long recognized that where, as here, a class plaintiff successfully recovers a common fund for the benefit of a class, the costs of litigation should be spread among the fund's beneficiaries. *See id.* (citing *Trustees v. Greenough,* 105 U.S. 527, 15 Otto 527, 26 L.Ed. 1157 (1881)); *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *In re Sumitomo Copper Litig.,* 74 F.Supp.2d 393, 396–97 (S.D.N.Y.1999). The traditionally recognized purposes of this common fund doctrine are to make "fair and just allowances" to plaintiffs' counsel, *Greenough,* 105 U.S. at 536, 105 U.S. 527, and also to prevent unjust enrichment by the beneficiaries of plaintiffs' efforts, *See Mills,* 396 U.S. at 392, 90 S.Ct. 616.

 Similarly, the Second Circuit recognizes that class counsel who create a settlement fund for the benefit of a class are entitled to be compensated for their services from that settlement fund. *See Van Gemert v. Boeing Co.,* 590 F.2d 433, 439–40 (2d Cir.1978); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 468–69 (2d Cir.1974). This Court has also recognized that principle. *In re American Bank Note,* 127 F.Supp.2d at 430.

In granting fees in cases such as this, courts recognize that such awards serve the dual purposes of encouraging representatives to seek redress for injuries caused to public investors and discouraging future misconduct of a similar nature. *See In re Union Carbide Corp. Consumer Products Business Sec. Litig.,* 724 F.Supp. 160, 169 (S.D.N.Y.1989).

For the common fund rule to apply, the applicant's efforts must confer a "substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread costs proportionately among them," an award of attorneys' fees must operate to shift the costs of litigation to that group. *Mills,* 396 U.S. at 393–94, 90 S.Ct. 616. All these elements are present here: Plaintiffs' Class Counsels' efforts have conferred a substantial benefit (approximately 41% of recoverable losses) on an ascertainable class, and the fee award sought here will operate equitably "to shift the costs of litigation" to the benefitting group—the Class members.

## B. THE REQUESTED FEE IS FAIR AND REASONABLE UNDER THE PERCENTAGE METHOD

 Courts traditionally have used two methods to calculate reasonable attorneys' fees in securities class actions: (1) the percentage of the fund approach, and (2) the "lodestar/multiplier" approach. Under the percentage approach, a reasonable fee is based on a percentage of the common fund bestowed on the class. *See In re*

*American Bank Note,* 127 F.Supp.2d at 430. The alternative method, the lodestar/multiplier approach, was developed by the Third Circuit in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 165 (3d Cir. 1973) ("*Lindy I* ") and *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 110 (3d Cir.1976) ("*Lindy II* "), and involves calculation of a lodestar figure by multiplying the number of hours expended by counsel by a reasonable hourly rate, in order to get a base fee award number. This figure is typically enhanced by an appropriate multiplier to reflect consideration of a number of factors, including the contingent nature of success and the quality of the attorney's work. *See Lindy I,* 487 F.2d at 168.

Congress amended the Securities Exchange Act of 1934 through the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(a)(6), and indicated a preference for the use of the percentage method. The PSLRA states that "Total attorneys fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed *a reasonable percentage* of the amount of any damages and prejudgment interest actually paid to the class[.]" (Emphasis added).

Although the Second Circuit has held that both the percentage and lodestar methods may be used by district courts, *see Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 50 (2d Cir.2000), the trend within this Circuit is to use the percentage of recovery method to calculate fee awards to class counsel in cases where the settlement results in the creation of a common fund. *See, e.g., Gwozdzinnsky v. Sandler Assocs.,* 159 F.3d 1346 (2d Cir. 1998); *In re American Bank Note,* 127

F.Supp.2d at 432; *Chatelain v. Prudential–Bache Secs., Inc.,* 805 F.Supp. 209, 215 (S.D.N.Y.1992); *In re Presidential Life Secs.,* 857 F.Supp. 331, 337 (S.D.N.Y.1994); *In re Sumitomo,* 74 F.Supp.2d at 400; *Adair v. Bristol Technology Systems, Inc.,* 1999 WL 1037878, *3–4, 1999 U.S. Dist. LEXIS 17627, *8–9 (S.D.N.Y.1999); *In re Blech Sec. Litig.,* 2000 WL 661680, *1, 2000 U.S. Dist. LEXIS 6920, *1 (S.D.N.Y. 2000); *In re NASDAQ Market–Makers Antitrust Litig.,* 187 F.R.D. 465, 484 (S.D.N.Y.1998).[8]

In sum, there is a strong consensus—both in this Circuit and across the country—in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery. For all of the reasons previously accepted by courts in this Circuit and elsewhere, the percentage-of-recovery method should be applied in this common fund case.

### 1. *The Requested Percentage Is Fair, Reasonable, And Adequate*

Counsel's request for an award equal to 33⅓% of the Class Settlement Fund recovered for the Class as a result of their considerable efforts is fair and reasonable and warrants this Court's approval. Courts in this Circuit have awarded fees ranging from 15% to 50% of the settlement fund. *See Chatelain,* 805 F.Supp. at 215; *In re Union Carbide,* 724 F.Supp. at 160. Petitioners' request is well within this range and falls comfortably within the range of fees typically awarded in securities class actions.

■ To determine that an award is fair and reasonable, courts have examined the facts of the case under a variety of factors including, *inter alia:* (a) the time and labor expended by counsel; (b) the magni-

---

8. In addition to this Circuit, in recent years a majority of Circuits have approved the percentage-of-recovery method. *See In re Ameri-* *can Bank Note,* 127 F.Supp.2d at 430–31 and cases cited therein.

tude and complexities of the litigation; (c) the risk of the litigation; (d) the quality of representation; (e) the requested fee in relation to the settlement; and (f) public policy considerations. *Goldberger,* 209 F.3d at 50. *See also In re Presidential Life,* 857 F.Supp. at 335 (citing *Cranston v. Hardin,* 504 F.2d 566, 578 (2d Cir.1974)); *City of Detroit,* 495 F.2d at 470; *In re Warner Communications Sec. Litig.,* 618 F.Supp. 735, 746–47 (S.D.N.Y.1985), *aff'd* 798 F.2d 35 (2d Cir.1986). Finally, in "cross-checking" the percentage fee against the lodestar-multiple, it clearly appears that the modest multiplier of 4.65 is fair and reasonable.

### a. The Time and Labor Expended By Counsel

■ The expenditure of 2,245.7 hours, resulting in a lodestar of $823,017.75, and expenses of $200,371.93 by Plaintiffs' Class Counsel attests to the extensive effort by counsel herein. In this Action, Plaintiffs' Class Counsel did not "piggy back" on any prior governmental action related to Del Global. *See In re Gulf/Oil Cities Serv. Tender Offer Litig.,* 142 F.R.D. 588, 597 (S.D.N.Y.1992). *See also In re APAC,* No. 97 Civ. 9145, at 2–3 (awarding 33–1/3% of settlement fund plus expenses and recognizing that there was no "boot-strapping" by plaintiffs' counsel). Plaintiffs' Class Counsel developed, litigated and successfully negotiated this Action by themselves, expending substantial time and effort.

### i. Plaintiffs' Class Counsel Thoroughly Investigated The Legitimacy And Viability Of Plaintiffs' Claims

Plaintiffs' Class Counsel had to acquire a thorough understanding of Del Global's internal structure—including its numerous divisions and their varied products—its processes and procedures, and its business operations. This information was obtained both from public documents and, more im-

portantly, from interviews with former employees. Plaintiffs' Class Counsel were also required to develop a thorough understanding of the accounting rules and regulations applicable. to Del Global's business dealings. This information was gleaned from the accounting expert after discussing with him the activities described by the former employees. Finally, Class Counsel conferred with their damage expert to assess the damages to the Class due to the alleged misconduct.

### ii. Plaintiffs' Class Counsel Fully Briefed Six Motions To Dismiss

On April 13, 2001, the defendants each served motions to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b). In sum, six separate motions to dismiss were filed by the defendants. Plaintiffs opposed said motions and the defendants thereafter served reply papers in further support of their motions to dismiss.

Defendants vigorously argued that: (1) no material misrepresentations had been alleged because the precise amount of the overstatement was not alleged; (2) any remaining alleged misrepresentations amounted to no more than inactionable puffery or statements of optimism; (3) scienter under Fed.R.Civ.P. 9(b) and the PSLRA had not been adequately pled; and, (4) the scienter allegations based on their insider trading did not demonstrate motive and opportunity. Deloitte further argued that (1) no material misstatements were alleged because there was no restatement; (2) that there were no facts indicating that Deloitte should have known about the improper accounting practices and lack of internal controls; and, (3) that claims relating to Del Global's 1997 Form 10–K were time-barred. Plaintiffs vigorously opposed this characterization of the Complaint.

These motions were *sub judice* when the parties reached the Settlement.

### iii. *Appearances Before The Court*

Plaintiffs' Class Counsel appeared before the Court a number of times in relation to appointment of Lead Plaintiff, selection of Lead Counsel, consolidation of the various cases and status reports.

### iv. *Participation In Settlement Negotiations*

Plaintiffs' counsel and defendants' counsel engaged in lengthy and intensive armslength negotiations that occurred over a period of several months, both face-to-face and telephonically. The attorneys conducted these negotiations under the threat of the dire financial condition of the Company, including its extremely poor cash situation, its potential immediate bankruptcy, the threat of the insurance company disclaiming and the ongoing investigation into the alleged fraud by the SEC.

### b. *The Magnitude and Complexities of the Litigation*

A securities case such as this one, "by its very nature, is a complex animal . . . ." *Clark v. Lomas & Nettleton Fin. Corp.*, 79 F.R.D. 641, 654 (N.D.Tex.1978), *vacated on other grounds*, 625 F.2d 49 (5th Cir.1980), *cert. denied*, 450 U.S. 1029, 101 S.Ct. 1738, 68 L.Ed.2d 224 (1981). As set forth more fully above, plaintiffs faced substantial factual and legal hurdles in establishing their core allegations, including showing that the defendants violated GAAP and GAAS, that the individual defendants participated in the alleged fraud, and that Deloitte ignored "red flags" that fraud was being committed. Plaintiffs faced issues on causation and damages. These difficulties were the subject of numerous settlement discussions over the course of the litigation. In addition to the legal difficulties, there were the aforementioned factual difficulties of a possible bankruptcy and insurance company disclaimer.

### c. *The Risk of the Litigation*

Even if the Class were able to overcome a motion to dismiss, a motion for summary judgment and a jury verdict, they would still confront the question of the amount of damages, if any, incurred by the Class. *See Chatelain*, 805 F.Supp. at 213 (complex issue of establishing damages would require battle of the experts). Then, even if all other hurdles were overcome, there was the possibility of appeal. As pointed out in *In re Warner*, "[a]n appeal could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself." 618 F.Supp. at 748. *See also Chatelain*, 805 F.Supp. at 213 (possible appellate litigation would further increase costs and uncertainty). In view of the difficulties and complexities of the case, plaintiffs would bear the risk of losing at trial, having the case dismissed prior to trial or having a diminished recovery following victory and appeals.

Plaintiffs' Class Counsel have received no compensation during the course of this litigation despite having made a significant time commitment and incurred significant expenses to bring this action to a successful conclusion for the benefit of the Class. Any fee award or expense reimbursement to Plaintiffs' Class Counsel has always been contingent on the result achieved and on this Court's exercise of its discretion in making any award. "Class counsel undertook a substantial risk of absolute nonpayment in prosecuting this action, for which they should be adequately compensated." *In re Dun & Bradstreet Credit Serv. Customer Litig.*, 130 F.R.D. 366, 373 (S.D.Ohio 1990). *See also City of Detroit v. Grinnell Corp.*, 356 F.Supp. 1380 (S.D.N.Y.1972), *aff'd in part and rev'd in part on other grounds*, 495 F.2d 448 (2d

Cir.1974) ("No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success"); *In re Sumitomo*, 74 F.Supp.2d at 399 (class counsel not only undertook risks of litigation, but advanced their own funds and financed the litigation).

### d. The Quality of Representation and Substantial Benefit to the Class

The quality of opposing counsel is also important in evaluating the quality of the services rendered by Plaintiffs' Class Counsel. *See In re Computron Software, Inc.*, 6 F.Supp.2d 313, 322 (D.N.J.1998). Here, the defendants were ably represented by five separate law firms, many of which are nationally prominent. The ability of plaintiffs' counsel to recover a settlement valued at more than $11.5 million for the Class in the face of such formidable legal opposition provides further evidence of the quality of their work.

"The critical element in determining the appropriate fee to be awarded class counsel out of a common fund is the result obtained for the Class through the efforts of such counsel." *Mashburn v. National Healthcare, Inc.*, 684 F.Supp. 679, 693 (S.D.Ala.1988). *See also Hensley v. Eckerhart*, 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ("most critical factor is the degree of success obtained"); *Behrens v. Wometco Enters.*, 118 F.R.D. 534, 547–48 (S.D.Fla.1988), *aff'd*, 899 F.2d 21 (11th Cir.1990) ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained.").

While this Action was settled before a trial, such efficient prosecution of plaintiffs' claims weighs in favor of a finding of the quality of Plaintiffs' Class Counsel's representation here, especially given the dire financial straits of Del Global. "[A]

prompt and efficient attorney who achieves a fair settlement without litigation serves both his client and the interests of justice." *McKenzie Construction Inc. v. Maynard*, 758 F.2d 97, 101–2 (3d Cir.1985). In the context of a complex class action, early settlement has far reaching benefits in the judicial system.

### e. Requested Fee in Relation to the Settlement

The requested fee is to be awarded *pari passu* with other members of the Class. Only the $2 million cash portion of the Settlement is certain. There is a risk of non-payment of the $2 million corporate note in five years; there is a risk that the Del Global stock, currently de-listed, may not trade at its present price (or at all in the future); there is a risk that the warrants, presently in the money, will not retain their strike price. In light of the uncertainties surrounding the case, the requested fee is fair and reasonable.

### f. Public Policy Considerations

In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered. Courts have recognized the importance that fair and reasonable fee awards have in encouraging private attorneys to prosecute class actions on a contingent basis pursuant to the federal securities laws on behalf of those who otherwise could not afford to prosecute.

In complex securities class actions, able counsel for plaintiffs can be retained only on a contingent basis. As noted in *In re Union Carbide*, 724 F.Supp. at 169, "[a] large segment of the public might be denied a remedy for violations of the securities laws if contingent fees awarded by the courts did not fairly compensate counsel for the services provided and the risks undertaken." The Supreme Court has

also emphasized that private actions provide " 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.' " *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) (quoting *J.I. Case Co. v. Borak,* 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964)). *See also Bullock v. Administrator of Estate of Kircher,* 84 F.R.D. 1, 11–12 (D.N.J.1979), (recognizing "the societal value of class action litigation"); *Ressler v. Jacobson,* 149 F.R.D. 651, 657 (M.D.Fla.1992) ("[a]ttorneys who bring class actions ... are vital to the enforcement of the securities laws"). It is therefore imperative that the filing of such contingent lawsuits not be chilled by the imposition of fee awards which fail to adequately compensate counsel for the risks of pursuing such litigation and the benefits which would not otherwise have been achieved but for their persistent and diligent efforts.

Private attorneys should be encouraged to take the risks required to represent those who would not otherwise be protected from socially undesirable activities like securities fraud. Thus, important public policy considerations will be promoted by the award of the fees requested herein.

## C. *THE REACTION OF THE CLASS CONFIRMS THE REASONABLENESS OF THE REQUESTED FEES*

The reaction by members of the Class is entitled to great weight by the Court. *See In re American Bank Note,* 127 F.Supp.2d at 425 (no objections); *In re Presidential Life,* 857 F.Supp. at 336 (lack of objections relieved court of its doubts regarding settlement); *Stoetzner v. United States Steel Corp.,* 897 F.2d 115, 118–19 (3d Cir.1990) ("only" 29 objections in 281 member class "strongly favors settlement").

As noted above, 2,086 Notices of the proposed Settlement and the January 28, 2002 hearing thereon were mailed out, and a Summary Notice was published in the national edition of *The Wall Street Journal.* The Notices clearly set forth that Plaintiffs' Class Counsel would apply for an award of fees of not more than 33 ⅓% of the Class Settlement Fund, plus reimbursement of all costs and expenses not to exceed $700,000. All Class members were given the opportunity until January 7, 2002 to object to Petitioners' fee request. Not one person, company, or institution has filed an objection to the fee request or the expense reimbursement sought. As was true with the underlying settlement, this overwhelmingly positive response by the Class attests to the approval of the Class with respect to the Settlement and the fee and expense application.

## CONCLUSION

The settlement is fair and the requested attorneys' fees and expenses are reasonable according to the applicable legal standards in light of the risks incurred, the result achieved, and the effort expended. Thus, the settlement is approved, and Plaintiffs' Class Counsels' motion for an award of attorneys' fees of 33⅓% of the Class Settlement Fund (to be paid *pari passu,* until the Class members' recovery, including a proportionate share of the accrued interest on the Class Settlement Fund), and for reimbursement of out-of-pocket costs and expenses in the amount of $200,371.93, is granted.